```
                                                                    1

 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   UNITED STATES OF AMERICA,          )
                                        )
 6   v.                                 )   CRIMINAL ACTION NO.
                                        )   2:22cr15^
 7   CHRISTIAN GAGE PUENTE,             )
                                        )
 8        Defendant.                    )
                                        )
 9                                      )
     - - - - - - - - - - - - - - - - - -
10

11
                       TRANSCRIPT OF PROCEEDINGS
12
                            Norfolk, Virginia
13
                             March 2, 2022
14

15
     BEFORE:    THE HONORABLE DOUGLAS E. MILLER
16              United States Magistrate Judge

17

18   APPEARANCES:

19        UNITED STATES ATTORNEY'S OFFICE
          By:  Darryl Mitchell
20               Assistant United States Attorney
                 Counsel for the United States
21
          FEDERAL PUBLIC DEFENDER'S OFFICE
22        By:  Keith Kimball
                 Assistant Federal Public Defender
23               Counsel for the Defendant

24

25
```

2

1 (Hearing commenced at 2:57 p.m.)
2 THE CLERK: United States versus Christian Gage
3 Puente, case 2:22cr15.
4 Is the government ready, Mr. Mitchell?
5 MR. MITCHELL: The United States is ready.
6 THE CLERK: Ready, Mr. Kimball?
7 MR. KIMBALL: Judge, we are ready. Good afternoon,
8 Your Honor.
9 THE COURT: Good afternoon, Mr. Kimball.
10 All right. It's my understanding Mr. Puente is here
11 for a detention hearing. Did both counsel receive the bond
12 report in his case?
13 MR. KIMBALL: Yes, Judge.
14 MR. MITCHELL: Yes, Your Honor.
15 THE COURT: And, Mr. Mitchell, is the United States
16 still seeking detention?
17 MR. MITCHELL: Yes, Your Honor.
18 THE COURT: Are we going forward with the hearing
19 today, Mr. Kimball?
20 MR. MITCHELL: Yes, Your Honor. Oh, apologize.
21 THE COURT: Okay. You all can have a seat.
22 Mr. Mitchell, are you going to proceed by proffer or
23 call a witness?
24 MR. MITCHELL: By proffer, Your Honor.
25 THE COURT: All right.

1         MR. MITCHELL:  This is a presumption case, Your
2    Honor.  The presumption of detention applies to each and
3    every count in the indictment.  Our proffer is this, Your
4    Honor:  On October 12 of 2021, the case agents used a
5    Virginia Beach confidential informant to contact Defendant
6    Rountree, one of the other defendants in the case, to arrange
7    the purchase of a quantity of methamphetamine.  Ms. Rountree
8    advised the confidential informant that she would actually
9    obtain the methamphetamine from her source in Chesapeake the
10   following day.
11        On October 13, 2021, the case agents found
12   Ms. Rountree and Defendant Williams, who operated a white
13   Dodge pickup, to the Aloft Hotel on Crossways Boulevard in
14   Chesapeake at approximately 8:11 p.m.  The investigators
15   observed Ms. Rountree carrying a backpack, and Mr. Williams
16   exit the vehicle.  Ms. Rountree and Mr. Williams together
17   entered the lobby of the Aloft Hotel and proceeded to the
18   elevator.
19        At approximately 8:37 p.m., investigators observed
20   Ms. Rountree and Mr. Williams departing the Aloft Hotel
21   parking lot in the pickup.  The investigators followed
22   Ms. Rountree and Mr. Williams to the Northampton
23   Boulevard/Shore Drive area in Virginia Beach where the police
24   conducted a traffic stop with the white Dodge.
25        Mr. Williams and Ms. Rountree were detained, and the

1   vehicle was searched.  The police discovered $960 in cash and
2   a total of approximately eight kilograms of methamphetamine
3   in the cab of the vehicle.
4           Customs and Border Protection Laboratory results
5   show that the seized substance was a total of 7,846.6 or
6   approximately 7.8 kilograms of methamphetamine hydrochloride
7   with a minimum purity of 93.9 plus or minus 2.1 percent.
8           At approximately 9:17 p.m., Special Agent George Fox
9   advised Ms. Rountree of her *Miranda* rights.  She admitted
10  there were lawful (sic) kilograms of methamphetamine in the
11  truck.  She admitted she received the methamphetamine from
12  her sources at the Aloft Hotel in Chesapeake earlier that
13  day.
14          She identified her source as Christian, also known
15  as Loco, this defendant, Mr. Puente, and Los, Mr. Santos,
16  Carlos Santos-Navarro.  She admitted her sources were staying
17  in room 214 at the Aloft.  She further advised that
18  Mr. Puente had indicated to her that he had 50 additional
19  kilograms of methamphetamine available for distribution.
20          She indicated that her source expected to receive
21  payment for the methamphetamine that night and would come to
22  Rountree's hotel room at the Travel Lodge Motel on Shore
23  Drive to pick up the money.  Ms. Rountree admitted that she
24  had conducted two or three transactions obtaining
25  methamphetamine from the sources and delivery of both drugs

1  to her customer.
2         She was allowed to call a 757 number, one of the
3  recent call numbers on her cell phone, which she indicated
4  was Christian, this defendant's phone.  The call was
5  answered.  Ms. Rountree asked the person on the other end if
6  she was talking to Loco, Mr. Puente's nickname.  The
7  answering party informed Ms. Rountree that they had to pick
8  money up from two others, and that they'd come to Rountree's
9  hotel to pick up her money.
10        Later Ms. Rountree placed a second call to the same
11 number, the answering party, who informed Ms. Rountree that
12 he was close.  On this same occasion, Task Force Officer
13 Scott conducted surveillance of rooms 212 and 214 at the
14 Aloft Hotel.  He witnessed this defendant, Mr. Puente, as
15 well as Mr. Santos-Navarro, coming and going from both hotel
16 rooms.
17        Finally, he observed Mr. Puente and
18 Mr. Santos-Navarro leaving room 214 together.  Mr. Puente was
19 carrying a Nike Air Jordan shoebox and a liquor bottle.
20 Mr. Puente, Mr. Santos-Navarro, and two females entered a
21 white Chevrolet Silverado pickup in the parking lot.
22 Investigators maintained surveillance on that vehicle.
23        On October 14, 2021, this is the same occasion,
24 simply after midnight, Your Honor, at approximately 12:42
25 a.m., investigators observed the white Chevy pickup arrive at

1   the Travel Lodge Hotel on Shore Drive.  Mr. Puente and
2   Mr. Santos-Navarro exited the truck and walked away from the
3   vehicle.  Investigators approached the vehicle and detained
4   the two females.  The police approached Mr. Puente and
5   Mr. Santos-Navarro as well.  Mr. Santos-Navarro was taken
6   into custody, and a loaded 9 millimeter firearm was recovered
7   from his person.
8          As the police were approaching him, Mr. Puente
9   tossed a loaded handgun into a bush.  This firearm was
10  recovered, and it's described as a loaded Taurus .38 caliber
11  revolver.  Mr. Puente then proceeded to resist arrest, and he
12  committed an assault on Virginia Beach Police Department
13  Detective Hearl, H-e-a-r-l.
14         Investigators searched the Chevy truck and located a
15  Nike Air Jordan's shoebox.  Inside the box investigators
16  discovered a plastic bag containing 893.4 grams of
17  methamphetamine, 893.4, with an average purity of 91.4 plus
18  or minus 2.1 percent, according to the Customs and Border
19  Protection Laboratory report, as well as a digital scale
20  bearing white residue.
21         Elsewhere in the vehicle the police discovered
22  $5,329 in cash, as well as something identified as a kilogram
23  press.  During a further search of Mr. Santos-Navarro, the
24  police discovered a quantity of cocaine.  During the further
25  search of Mr. Puente, the police discovered 12.31 grams of

1  methamphetamine, that is per a Customs and Border Protection
2  Laboratory report.
3          Then a subsequent execution of the search warrant in
4  room 214 at the Aloft Hotel in Chesapeake, investigators
5  discovered another kilogram press as well as powder cocaine,
6  volumes of powder cocaine, a lined mirror prepared for
7  inhalation.
8          Thank you, Your Honor.
9          THE COURT:  All right, Mr. Kimball.  Do you have any
10 evidence, either by way of proffer or witnesses?
11         MR. KIMBALL:  Judge, just a proffer.
12         THE COURT:  All right.
13         MR. KIMBALL:  Your Honor, first with regard to the
14 offense, I mean, I've only been in the case a couple of days,
15 but my investigation is that at most my client was a
16 middleman.  He was not the supplier of the alleged drugs in
17 this case.  As far as his personal history and
18 characteristics and release plan, Judge, I spoke with his
19 mother.  She's mentioned in the pretrial services report,
20 Judge, Susan Puente.  She lives here in Norfolk.  She was
21 going to be here today, but, unfortunately, she had to care
22 for her 90-year-old father, who is my client's grandfather,
23 so she couldn't get anybody to provide for him so that's why
24 she's not here.
25         As the pretrial services report notes, Judge, my

1  client was born in Maryland but basically was raised here in
2  Virginia Beach.  And except for a brief period of time when
3  he lived in Texas, he has lived basically in this area.
4  Primarily in Virginia Beach, and his mother confirmed that as
5  well.
6          She also confirmed that his father's in this area.
7  She has another son who is in the United States Army.  He is
8  currently deployed.  Christian has another brother by his --
9  who is a half-brother, it's his father's son, not his
10 mother's.  But he's also here locally in the area, Judge.
11 His mother is obviously aware of his incarceration and the
12 pending charges.  She still supports and loves her son,
13 Christian.  If he were to be released, he would not be living
14 with the mother, but she indicated that she would do
15 everything she could to help him primarily seek out any drug
16 counselling that may be appropriate and drug treatment.
17         And she also confirmed, Judge -- it's mentioned in
18 the report -- that Christian has three children in the area,
19 and that before he was arrested, there was a period of time
20 where he saw his children on a regular basis.  At the time of
21 his immediate arrest, he did not.  But shortly before that,
22 in the past few years, he has been in their life, Judge.
23 He's told me that, but more importantly, his mother's
24 confirmed that.
25         Also, Judge, she's here, the proposed third-party

9

1    custodian, Kristy Rosa Guzman -- Kristy -- and she also
2    confirmed that about the children.  And to be clear, Judge,
3    she is not the mother of his children, but she has known
4    Christian for about ten years.  They have not been in a
5    romantic relationship for that long, but they have been
6    friends.  I understand they're family friends as well.
7              She is employed, Judge, at Sentara Virginia Beach
8    General Hospital.  She works in the housekeeping department,
9    has been there for about two years.  She lives in Virginia
10   Beach.  She has a roommate who also is employed at Virginia
11   Beach General Hospital.  She does not use drugs.  She doesn't
12   have a criminal record.  She doesn't condone drug use or drug
13   trafficking, anything of the sort.  There's no weapons in the
14   residence, and, you know, importantly, she is not only
15   willing to let Christian come live with her, but she's also
16   willing to be a third-party custodian.  I would proffer to
17   the Court, Your Honor, that I discussed what her specific
18   obligations and responsibilities would be, and she's willing
19   to take that on.
20             Additionally, Judge, she has taken it upon herself
21   to basically seek out employment for Christian should he be
22   released.  The pretrial services report knows that my client
23   principally, Your Honor, has been employed doing construction
24   work, primarily drywall work.  She has been in touch with two
25   companies.  She knows the people that work there.  She knows

1  the owner of each.  One is Bayron Drywall, I think it's a
2  limited LLC, Judge.  The other is a man by the name of Ron
3  Valez, who is also in the area.  Both of them would
4  certainly -- they couldn't guarantee employment for my
5  client, but with his experience, they felt pretty confident
6  that he would be able to find work with them.
7       That would really be the extent of my proffer,
8  Judge.  Just argument when you're ready to hear it.
9       THE COURT:  Okay.  Mr. Mitchell.
10      MR. MITCHELL:  Your Honor, I only first point out
11 that the state court saw fit to detain this defendant and his
12 co-defendant, Mr. Santos-Navarro, on substantially similar
13 charges arising from the same incident.
14      This defendant is facing 15 years minimum, mandatory
15 minimum time, based on his charges, Your Honor.  He was
16 caught with a quantity of methamphetamine in excess of 50
17 grams, and that's, of course, a 10-year mandatory minimum
18 under 21 U.S.C. Section 841(b)(1)(A).  And he was
19 simultaneously in possession of a loaded revolver, and that
20 supports a charge under 18 U.S.C. Section 924(c)(1)(A) of
21 possessing a firearm in furtherance of a drug trafficking
22 crime, and that's how he's charged in the indictment, Your
23 Honor.  So he's facing 15 years minimum time.
24      His employment history, Your Honor, is entirely
25 unverified.  He says that he worked as a freelance

1  subcontractor in the local area doing drywall, and roof
2  framing, painting, and landscaping jobs.  But other than that
3  statement, there is absolutely no proof that he was recently
4  engaged in any legitimate, lawful employment, in contrast to
5  the drug activity that he was involved in in this case for
6  which he was obviously making a profit, picking up the
7  proceeds of the activity at the time he was arrested.
8           Several times in the past when he has been charged
9  with a crime and placed on probation or some conditions of
10 release short of detention, he has proceeded to violate those
11 conditions following the same, both an arrest in 2013 for
12 grand larceny from the person and obtaining money by false
13 pretenses.  He was found guilty of those charges, petty
14 larceny and obtaining money by false pretenses, was placed in
15 a community correction program and was returned to Court on
16 multiple occasions for failing to comply with the conditions
17 of his community correction program release.
18          Began in October of 2015, he was arrested for
19 failing to comply with the community corrections program.
20 Then he let his -- he had that revoked.  And then later in
21 2017, he's arrested again, in June of 2017, for failing to
22 comply with community corrections, and his community
23 corrections sentence was eventually revoked.
24          He's been convicted of failing to appear on more
25 than one occasion.  Was convicted of failing to appear in

1   2016.  Then again in 2016 he's charged with DUI, first
2   offense, found guilty, and placed on ASAP, was subsequently
3   revoked for failing to comply with ASAP.
4           Then in 2020 he's charged with assault and battery
5   of a family member.  He's eventually found guilty of that.
6   He failed to appear for court in Virginia Beach on July 9th,
7   2020.  A bond was issued, and he was eventually found guilty
8   of failing to appear.  He's violated protective orders
9   directed at him by courts of law, and, of course, in this
10  case, in addition to the drug activity, he assaulted a law
11  enforcement officer.  We believe that he represents a danger
12  to the community.  He's also a substantial risk of flight.
13  We would ask that he be ordered detained pending disposition
14  of this case.  Thank you, Your Honor.
15          THE COURT:  All right, Mr. Kimball.
16          MR. KIMBALL:  Judge, I failed to mention that when I
17  spoke with his mother, she confirmed his employment history
18  as far as drywall work really for -- since he really got out
19  of school.  He was only doing that for about eight or nine
20  years.  So -- at least that still weighs, one way or the
21  other, Judge, but I had to correct that, and that was my
22  error for not mentioning to the Court.
23          THE COURT:  That's all right.
24          MR. KIMBALL:  I also failed to mention, Judge, that
25  my understanding is that the vehicle that was searched when

1  Christian was arrested, Your Honor, was not his vehicle.  And
2  as far as the offense is concerned, obviously, that goes to
3  the danger prong.  There's some questions here.  You know,
4  you have statements from a co-defendant who makes a statement
5  after she's arrested.  She's not here.  She's not before the
6  Court.  You know, how much weight do you attach to that?  And
7  what else did she tell the police?  You know, my
8  understanding, is, at best, like I said, my guy's a
9  middleman.
10         But at any rate, as far as whether or not he is a
11 risk of flight, Judge, he basically has ties to the
12 community, and I will note that the charged conspiracy, it is
13 about a month and a half.  Sure, we're dealing with a lot of
14 weight here, but we don't have any evidence specifically,
15 credible evidence that he knew the quantities, that even if
16 he's a middleman and knows that there is some drugs, we don't
17 know if he knew the exact amount.
18         So, again, there is some questions regarding the
19 strength of the evidence.  Sure, you hear these kilo
20 quantities, and, sure, that's a lot at first, but then you
21 start to really look at the evidence.  Is it still there to
22 show that this man was the supplier, if you will, Your Honor.
23         But as far as, you know, whether he should be
24 released, Your Honor, you know, he does not have the
25 financial means to disappear if released, Judge.  He has

1   three children in the area, very small age, who he would very
2   much like to see before this case is disposed of.
3           If he's released on bond, Judge, he's not going to
4   do anything to make the situation worse.  He's not going to
5   jeopardize any options that he may have.  He's not stupid,
6   Your Honor.  A lot of these offenses, Your Honor, you know,
7   he -- he's 27, and the offenses that are listed here is
8   criminal history -- you know, they're misdemeanors.  And the
9   Court's concern may be the failure to appear.  Well, the
10  first one was -- he was convicted on January 13, 2016.  He's
11  age 20, and it happened in October of 2015.  He had a DUI.
12          THE COURT:  The most recent one was September 23rd
13  of 2020.
14          MR. KIMBALL:  Right, Judge, and all of those
15  charges, Your Honor, as you can see, are domestic related,
16  and I'm not trying to downplay the seriousness of
17  domestic-related offenses or crimes, but a lot of times --
18          THE COURT:  Failing to pay support.
19          MR. KIMBALL:  What's that?
20          THE COURT:  It's not failing to pay support.  They
21  didn't issue this because he wasn't supporting his kids.  I
22  mean, it's assault and battery.
23          MR. KIMBALL:  No, no, Judge, I understand that.  But
24  my point is if you look at the sentences from the assault,
25  he's just found guilty and has to pay court costs.  Same with

15

1 the failure to appear. The protective order violation,
2 again, he has to pay court costs.
3 Now, as you see on the next page, he's convicted of
4 trespassing, and he's found guilty of destruction of
5 property. Well, again, you can see that that has to do with
6 the same situation that's on the preceding page. And if you
7 look at the sentences there, I think the judge who heard that
8 case could tell that there was circumstances, probably on
9 both sides, that led to whatever argument or dispute these
10 people were having.
11 My client, and I believe it was the mother of his
12 children, who is not the proposed third-party custodian, Your
13 Honor. So, again, that's -- juvenile court, it's some time
14 ago, pretty recent, but, you know, he's here in federal
15 court, Judge. As I said a minute ago, he is not going to do
16 anything to make his situation worse.
17 He has no prior felony convictions. I might have
18 noted that already. He's been drug free since he's been
19 incarcerated since mid-October. Certainly, Judge, this is a
20 case, I think, that despite the quantities, that the Court
21 could impose some conditions here, like home electronic
22 monitoring.
23 And the other concern is, okay, when is he going to
24 be arraigned? When are we going to have a trial date? I
25 think the Court can take that into consideration as to

1  whether he should be released or not on bond.
2          I mean, I have no idea of when Mr. Williams' case
3  ultimately is going to be disposed of.  It's a General
4  District Court.  It's set for whenever it's set.  Two months
5  later will go to Circuit Court.  It could be the fall before
6  that case is heard.  Again, I have no idea when Ms. Rountree
7  will be before the Court.  So it may technically not amount
8  to the speedy trial addition because they're defendants in
9  the same case, but it's certainly something the Court can
10 consider when imposing or deciding whether to impose a bond
11 or not.
12         THE COURT:  He hasn't been indicted two weeks.  I
13 mean, it's February 23rd of his return, is it not?  It's not
14 like anybody's dragging their feet.
15         MR. KIMBALL:  No, Judge, but my point is we don't
16 know when it will be.
17         THE COURT:  Okay.  I understand.
18         MR. KIMBALL:  You know, it's not a matter of just
19 nolle prossing and bringing the man here because --
20 Mr. Mitchell would have done that.  It's out of control.
21         THE COURT:  Anything else?
22         MR. KIMBALL:  So I just point out, Judge, that's a
23 circumstance that you can consider in deciding whether he
24 should be released.
25         THE COURT:  I understand.  Anything else?

17

1          MR. KIMBALL: That's all.

2          THE COURT: Okay. Mr. Mitchell, do you need to say
3 anything further?

4          MR. MITCHELL: No, Your Honor. Thank you.

5          THE COURT: Okay. I understand all your arguments,
6 and I appreciate Ms. Rosa Guzman or Ms. Guzman being here,
7 and she, I'm certain, would be a suitable custodian if
8 release were otherwise appropriate, but I don't find it
9 appropriate in these circumstances. I believe the government
10 has met its burden to show that Mr. Puente is both a danger
11 to the community and a risk of flight.

12          I disagree to the characterization of the
13 government's evidence. I mean, I think the evidence against
14 him is quite strong. Mr. Mitchell went through a detailed
15 proffer of basically the surveillance of the delivery of 8
16 kilograms of methamphetamine and then Mr. Puente's arrest
17 with another 800 grams of methamphetamine. Either of those
18 quantities are enough to put him in a weight. Officers who
19 arrested him saw him throw a handgun down.

20          So it's not like they're relying exclusively on the
21 testimony of Ms. Rountree in the indictment that they
22 presented to the Grand Jury. I think the evidence against
23 him is quite strong, and he is facing a lot of time as a
24 result of the seriousness of these charges. They're
25 completely different.

1          I agree with you, he doesn't have the worst criminal
2    record.  It's unfortunate, frankly.  Perhaps, if he had
3    received more severe consequences earlier, he might have been
4    able to avoid the situation he's in now.
5          But his past performance on supervision does not
6    give me any confidence that he would adhere to conditions of
7    release.  He has multiple revocations of suspended time.  I
8    counted at least three failures to appear, and I don't find
9    that the release plan that's been proffered is sufficient to
10   overcome the presumption that he be detained on the basis of
11   these charges and the Grand Jury's indictment, so I'm going
12   to detain him and issue written findings consistent with this
13   ruling.
14         I gather we are going to do the same thing and set
15   the same control date?
16         MR. MITCHELL:  Yes, Your Honor.
17         MR. KIMBALL:  Judge, I'm sorry, I just got the --
18   when was it?
19         MR. MITCHELL:  Monday, March 28th, 2:30.
20         THE COURT:  Monday, March 28th at 2:30.  Obviously,
21   he has remedies if there's -- you know, if Ms. Rountree
22   remains -- is it Ms. Rountree who's got the -- who's not in
23   custody yet?
24         MR. MITCHELL:  That's correct, Your Honor.
25         THE COURT:  So if there's, you know, an unreasonable

1  delay in apprehending her, you can, you know, bring a motion
2  to sever or do something else to try and move it along.  But
3  the Court has the ability to deal with that if it becomes a
4  problem.  I don't think it's a problem at this stage.
5          All right.  Anything else in this matter,
6  Mr. Mitchell?
7          MR. MITCHELL:  No, Your Honor.  Thank you.
8          THE COURT:  Mr. Kimball?
9          MR. KIMBALL:  Judge, I beg the Court's pardon.  What
10 time was the control date?
11         THE COURT:  2:30, I believe.  2:30.
12         MR. KIMBALL:  Thank you, Judge.
13         THE COURT:  All right.  The defendant is remanded.
14         Oh, wait, before I remand him, I do need to remind
15 the prosecution of its obligation in this matter to turn over
16 any evidence favorable to the accused material to either
17 guilt or innocence.  The failure to do so could have severe
18 consequences, including exclusion of evidence or other
19 sanction by the Court.  I'm entering a written order to
20 confirm this reminder.
21         All right.  Thank you.
22         MR. MITCHELL:  Thank you.
23         (Hearing adjourned at 3:24 p.m.)
24
25

```
                                                                  20

1                          CERTIFICATION
2
3         I certify that the foregoing is a correct
4    transcript, to the best of my ability, of the court's audio
5    recording of proceedings in the above-entitled matter.
6
7            X_____/s/_____x
8                         Jody A. Stewart
9                  X_____3-28-2022 _____x
10                             Date
```